IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CORAL AVIATION GROUP, JAMES DASTRA** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 23-1838** |
| | : | |
| **ANDREW M. MULLER, JR., CHRISTINA MULLER-LEVAN, READING JET CENTER, INC., DAVID HEATH, PETER KNIGHT, MILLENIUM AVIATION, INC.** | : | |

**MEMORANDUM**

**MURPHY, J.** **August 21, 2024**

This is a feud over who gets access to limited and valuable concession space at an airport. Plaintiff James Dastra, and his company Coral Aviation Group, allege that they were illegally squeezed out of the market for providing fuel and other aeronautical services at Reading Regional Airport when the airport authority purchased two private companies and took over fuel operations for itself. Plaintiffs say that the companies and people involved in this scheme violated federal antitrust laws.

The state's actions, even if coercive and anticompetitive, are immune from federal antitrust law. But when antitrust cases involve some combination of public and private action, it can be tricky to figure out how far that immunity protection extends. Here, the private defendants made a deal with the Reading Regional Airport Authority — a municipal entity. And when anticompetitive effects are foreseeable, the state's immunity flows to other government entities acting pursuant to a clearly expressed state policy, and, by extension, to private companies working at their direction. Further, private individuals enjoy a right to petition the government, even if they are hoping for an anticompetitive government action that benefits their

businesses. For either of these two reasons — so-called *Parker* immunity or *Noerr-Pennington* immunity — we find that the private defendants here enjoy immunity from plaintiffs' federal antitrust claims. Therefore, we dismiss them. We also decline to exercise jurisdiction over the remaining state law claims and so dismiss this case in its entirety.

## I. Background according to the amended complaint[1]

James Dastra owns[2] Coral Aviation Group (Coral), a company engaged in the business of flight transportation and other flight-related activities. DI 33 ¶ 2. Reading Regional Airport Authority (RRAA) is a municipal airport authority subject to the rules of the Federal Aviation Administration (FAA). *Id.* ¶ 4.

Around August 9, 2021, Mr. Dastra sent a letter to the RRAA, which outlined a proposal for Coral to lease ten acres from the RRAA to build hangar space that it planned to rent to Quest Diagnostics.[3] *Id.* ¶ 16. As part of the proposal, Coral wanted to become a fixed-base operator (FBO), which entails, among other things, selling fuel. *Id.* ¶ 18, 65.

Counsel for the RRAA responded with a letter that "expressed its support of Coral's proposed project." *Id.* ¶ 19. The letter laid out details of a lease proposal, stated that it would give plaintiffs the right of first refusal on any adjacent undeveloped land, and granted its engineering firm permission to assist Coral moving forward. *Id.*

---

[1] We draw these factual allegations from plaintiffs' amended complaint. DI 33. We summarize here only the factual allegations relevant to plaintiffs' federal antitrust claims.

[2] While the complaint does not explicitly state that Mr. Dastra owns Coral Aviation Group, this seems clearly implied by the complaint and subsequent briefing, which repeatedly refer to Mr. Dastra acting on behalf of Coral Aviation Group. *See e.g.*, DI 33 ¶¶ 16, 23, 46, 48, 86.

[3] Quest Diagnostics operates aircraft to move test samples around quickly.

Over the next several months, plans for the project continued to move forward. *Id.* at 20-21, 27-39. Plaintiffs retained individuals to prepare engineering reports and held meetings with the RRAA. *Id.* ¶¶ 21, 27-28, 36. They obtained letters of support for the project and its funding from several individuals and entities, including RRAA Chairman Michael A. Setley on behalf of him and the RRAA; the Berks County Office of the Commissioners; United States Congressman Dan Meuser; United States Congressman Barry Jozwiak; and the Bern Township Supervisors. *Id.* ¶¶ 29-33. Additionally, plaintiffs kept the RRAA and Quest Diagnostics informed about the progress of their plans. *Id.* ¶¶ 34-39.

The project began to stall in early 2022, when Andrew Muller and Peter Knight "requested and received a delay" of the project, which was "ostensibly to buy more time to undermine" the project. *Id.* ¶ 40. Andrew Muller owns Reading Jet Center, Inc., (Reading Jet) and was also a member of the RRAA.[4] *Id.* ¶¶ 7, 22. Mr. Dastra and Mr. Muller previously engaged in "protracted litigation that centered upon aggressively unfair treatment" perpetrated by the RRAA and Mr. Muller against Mr. Dastra and Coral. *Id.* ¶ 23.[5] Peter Knight is the owner of Millennium Aviation, Inc. (Millennium). *Id.* ¶¶ 9-10. Reading Jet and Millennium Aviation were existing FBOs at the airport. *Id.* ¶¶ 106, 108, 113.

Sometime around spring 2022, Andrew Muller spoke to Russ Strine[6] "clandestinely," saying he would vote to approve plaintiffs' proposal if they agreed that Reading Jet would

[4] Mr. Muller was a member of the RRAA "up to and including November of 2022," which includes a portion of the relevant events in this case. DI 33 ¶ 22.

[5] Specifically, the RRAA "attempted to use a technicality to evict Plaintiffs" from the RRAA. DI 33 ¶ 24.

[6] The amended complaint does not say what connection Russ Strine has to Coral, the RRAA, Reading Jet, or Millennium Aviation. DI 33.

provide fuel to plaintiffs' tenants. *Id.* ¶ 43. Mr. Strine shared this information with plaintiffs. *Id.* Additionally, Mr. Muller and his daughter, defendant Christina Muller-Levan, began making derogatory comments about plaintiff. *Id.* ¶¶ 1, 44-45.

A few months later, counsel for the RRAA forwarded a copy of a letter received from the Pennsylvania Department of Transportation stating that Reading Regional Airport was selected for funding. *Id.* ¶ 50. Around this time, the RRAA told plaintiffs that "they should remove the idea of selling fuel at the [a]irport, even though the same had been approved" because this would create fewer obstacles for plaintiffs' plan. *Id.* ¶ 51. This was repeated in a 2022 phone call where RRAA members "aggressively attacked Dastra over the fuel issue" and it became clear that Mr. Muller and Mr. Knight were "livid" about the prospect of Coral selling fuel at the airport. *Id.* ¶ 53.

In February 2023, counsel for the RRAA sent a letter to plaintiffs stating that the Board of the RRAA held a special meeting and voted to terminate discussions with plaintiffs about the construction of hangars and about Coral becoming an FBO. *Id.* ¶ 65. The letter further stated that to the extent any offer had been made, the offer was rescinded. *Id.* The RRAA's stated reason for this decision was that the RRAA had decided to "exercise its proprietary exclusive right to own and operate a sole fixed-based operator." *Id.*

As part of its decision to take over FBO operations at the airport, the RRAA reached a deal to pay the existing FBOs — Reading Jet and Millennium Aviation — $13,000,000 without an appraisal. *Id.* ¶ 72. Additionally, both Mr. Muller and Mr. Knight contributed to the political campaign of defendant Christian Leinbach, Commissioner of Berks County, and a member of the RRAA's board who "caused" the approval of the deal. *Id.* ¶¶ 11, 75-79.

## II. Procedural history leading to defendants' motions to dismiss

In their amended complaint, plaintiffs James Dastra and Coral Aviation Group sued the Reading Regional Airport Authority, Andrew Muller, Jr., Christina Muller-Levan, Reading Jet Center, Inc., David Heath, Peter Knight, Millennium Aviation, Inc., Christian Leinbach, Pamela Shupp Menet, and Zackary Tempesco, asserting claims under the Clayton Act, the Sherman Act, and for various state law violations. DI 33. Defendants filed five separate motions to dismiss. *See* DI 38; DI 41; DI 43; DI 44; DI 64. We held an oral argument on the motions to dismiss. DI 76.

In June 2024, plaintiffs filed a notice of voluntary dismissal as to the RRAA, Christian Leinbach, Pamela Shupp Menet, and Zackary Tempesco (the "airport defendants"). DI 82; DI 83. We then denied the motions to dismiss filed by the airport defendants as moot. DI 84.

The remaining motions to dismiss are:

- **The Knight defendants' motion** (DI 41): The "Knight defendants" include Peter Knight and Millennium Aviation, Inc. Peter Knight owned Millennium Aviation, Inc. DI 33 ¶ 9.
- **The Muller defendants' motion** (DI 43): The "Muller defendants" include Andrew Muller Jr., Christina Muller-Levan, and Reading Jet Center, Inc. Andrew Muller owned Reading Jet Inc. and served as its President. DI 33 ¶ 7. Mr. Muller was also a member of the RRAA board through November of 2022. *Id.* ¶ 22. Christina Muller-Levan is Andrew Muller's daughter and served as Secretary of Reading Jet Inc. *Id.* ¶¶ 1, 7.
- **David Heath's motion** (DI 64): Defendant David Heath also filed a separate motion to dismiss. Mr. Heath served as "an advisory or other such representative capacity at RRAA." DI 31 ¶ 8.

While these motions advance a variety of arguments, we focus on the argument that the defendants are entitled to immunity. Defendants argue they are shielded by the *Parker* state-action doctrine, which holds that antitrust laws do not apply to conduct by states. DI 38 at 8; DI 41 at 9-11; DI 43-1 at 18-23, 27. Because defendants argue that the RRAA runs a municipal airport, with the state legislature defining its authority, and the doctrine extends to private entities that contract with the state, they say this immunity applies to them. DI 38 at 8-10; DI 41 at 10.

Plaintiffs respond that *Parker* immunity applies only when the state has specifically authorized anti-competitive conduct, and that is not the case here. DI 50 at 12-14.

Additionally, defendants argue they are entitled to *Noerr-Pennington* immunity, which protects the right of private parties to petition the government. DI 41 at 7-9; DI 43 at 27-30. Plaintiffs argue that *Noerr-Pennington* immunity is not applicable here and, even if it were, defendants' actions fall under the "sham" exception to this doctrine, which does not extend immunity to petitioning that is "objectively meritless" and "an attempt to interfere directly with the business relationship of a competitor." DI 49 at 5-8.

## III. Standard of review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). A claim has facial plausibility when the facts pleaded permit a court to make the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* We take well-pleaded facts to be true, construe those facts in the light most favorable to the plaintiff, and draw reasonable inferences from them. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV. Analysis

### A. Plaintiffs' antitrust claims must be dismissed because defendants are entitled to *Parker* immunity

Under the *Parker* immunity doctrine, federal antitrust laws do not apply to actions taken by states. *See Parker v. Brown*, 317 U.S. 341 (1943).[7] This doctrine may extend to

---

[7] Though *Parker* discussed immunity under the Sherman Act, it also applies to claims brought under the Clayton Act. *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216 (2013).

municipalities or private actors, though the analysis varies based on whether "the relevant actor is comparable to a sovereign power, a private business, or something in between." *Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572 (3d Cir. 2017).

"[T]he Supreme Court has devised three approaches to analyzing a state-action defense." *Id*. The first is "ipso facto immunity," which grants immunity without the need for any further analysis for actions that are "an undoubted exercise of state sovereign authority," including those taken by state legislatures or state supreme courts. *Id.* (quoting *N.C. State Bd. of Dental Exam'rs v. F.T.C.,* 574 U.S. 494, 504 (2015)). The second is *Midcal* scrutiny, which applies when private parties seek *Parker* immunity because they acted "in accordance with state policy." *Edinboro,* 850 F.3d at 573; *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980).[8] To receive *Midcal* immunity, the private conduct "must pass a rigorous two-part test." *Edinboro*, 850 F.3d at 573. "First, the state must enact a 'clearly articulated and affirmatively expressed' policy permitting anticompetitive conduct; and second, the State must 'actively supervise[]' that conduct." *Id*. (quoting *Midcal*, 445 U.S. at 105). The third approach is *Hallie* immunity. *See Edinboro*, 850 F.3d at 573; *Town of Hallie v. City of Eau Claire*, 471 U.S. 34

---

*Parker* immunity is based on "the federalism principle that the States possess a significant measure of sovereignty under our Constitution." *Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572 (3d Cir. 2017) (quoting *Cmty. Commc'ns Co. v. City of Boulder, Colo.*, 455 U.S. 40, 53 (1982)).

[8] In *Midcal*, the Supreme Court held that California's wine-pricing system was not entitled to *Parker* immunity. *Id*. at 106. While state laws required wine producers, wholesalers, and rectifiers to file fair-trade contracts or price schedules with the state — and wine merchants could not sell wine to a retailer at prices set outside of these schedules or contracts — the state had "no direct control over wine prices, and it does not review the reasonableness of the prices set by wine dealers." *Id*. at 99-100. Thus, the California system failed the second prong of the *Midcal* test, which requires active supervision by the state, and was attempting to cast a "gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Id*. at 105-06.

(1985). *Hallie* immunity applies to municipalities because it generally presumed that a municipality "acts in the public interest." *Edinboro,* 805 F.3d at 573 (quoting *Hallie*, 471 U.S. at 45). Under *Hallie* immunity, an entity must still show it acted pursuant to a "clearly articulated and affirmatively expressed" state policy but need not fulfill the active supervision requirement of the *Midcal* test.

Because this case does not involve actions that are undoubtably an "exercise of state sovereign authority" such as those taken by a state legislature or supreme court, our first task is to determine whether to classify defendants under either of *Hallie* or *Midcal*. In *Edinboro*, the Third Circuit examined an alleged conspiracy to monopolize the student-housing market and determined that a state university and its nonprofit collaborator were both entitled to *Hallie* immunity. *Id*. at 570. The Third Circuit reasoned that the state university is more like a municipality than a private market participant because the university is an "'arm of the state'" presumed to "act[] in the public interest" and "[u]nlike a private business, the University's self-interest is more closely aligned with certain 'governmental interests of the State.'" *Id*. at 579 (quoting *Hallie*, 471 U.S. at 45-47).

The Third Circuit also extended *Hallie* immunity to the nonprofit collaborator because the antitrust injury stemmed "entirely from the conduct of the university." *Id*. at 573. The key anticompetitive conduct was the university's decision to expand its rule requiring more students to live in dormitories, whereas the nonprofit's behavior — including amending its charter, issuing bonds, building dormitories, and managing the property — was "consistent with participation in a competitive market." *Id.* at 574. Therefore, the nonprofit was "acting under the direction of" the university and was immune to the same extent as the university. *Id.* (quoting *Zimomra v. Alamo Rent-A-Car, Inc*., 111 F.3d 1495, 1500 (10th Cir. 1997)).

We think *Edinboro* is a close analogy to the present case. First, the RRAA is a municipal airport authority, which means its primary interests are "more closely aligned with certain governmental interest of the State" than with private parties.[9] *Id.* at 579; *see also Commonwealth v. Susquehanna Area Reg'l Airport Auth.*, 423 F. Supp. 2d 472, 478 (M.D. Pa. 2006) (finding the Susquehanna Area Regional Airport Authority subject to *Hallie* immunity); *Rectrix Aerodrome Ctrs., Inc. v. Barnstable Mun. Airport Comm'r*, 610 F.3d 8, 13 (1st Cir. 2010) (finding that the state action doctrine applies to a municipal airport); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231-36 (3d Cir. 1987) (finding *Hallie* immunity applicable to Chester County Solid Waste Authority). Thus, the RRAA itself is eligible for *Hallie* immunity.

Like the nonprofit in *Edinboro*, we find that the private companies and associated defendants here were "acting under the direction of" the airport authority. The RRAA voted to terminate discussions with plaintiffs during a special board meeting, chose to exercise its exclusive right to operate a sole fixed-based operator,[10] and "reached and approved" a deal with

---

[9] Plaintiffs' counsel said during oral argument that the RRAA is run by board members who he believes are appointed by the Berks County Commissioners. DI 80 at 7.

[10] In addition to claiming immunity, defendants argue there is no antitrust violation because the RRAA chose to exercise its exclusive right to provide aeronautical services at the airport, which is explicitly contemplated by the Federal Aviation Administration. DI 41, 2-4, 20-22; DI 55 at 5; DI 43-1 at 8-12. The parties point to FAA Advisory Circular 150/5190-6, which says "[t]he owner of a public-use airport (public or private) may elect to provide any or all of the aeronautical services needed by the public at the airport" and that "[a]n example of an airport sponsor choosing to provide an aeronautical service would be aircraft fueling." FAA Advisory Circular No. 150/5190-6 ¶ b.1; *see also Rectrix*, 610 F.3d at 12 (citing the FAA Advisory Circular to note that "[i]t appears that the FAA itself is content to have municipal airports reserve jet fuel sales to themselves, seemingly so as to allow airports to fund maintenance and improvements."); *In re Jet 1 Center, Inc.*, 322 B.R. 182, 196 (Bankr. M.D. Fla. 2005) (citing an FAA order to say "[t]he FAA Order leaves no doubt that airport proprietors, such as the Authority, exercise exclusive right to provide fuel and other services at the airport and must ensure control over prices charged for aeronautical services."). While this may be an additional reason to dismiss plaintiffs' antitrust claims, we need not evaluate this argument further because we find defendants are entitled to immunity.

the private company defendants. DI 33 ¶¶ 65, 72. To the extent that plaintiffs' antitrust injury stems from the private defendants, it is because they advanced the RRAA's deal. Thus, like the nonprofit in *Edinboro*, the private company defendants acted "under the direction of" the municipal authority. *Id.* at 575; *see also Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 159 (3d Cir. 1999) (noting while discussing *Noerr-Pennington*[11] immunity that "if relief is sought solely for injury as to which the state would enjoy immunity under *Parker*, the private petitioner also enjoys immunity"). Therefore, the private defendants in this case enjoy immunity to the same extent as the RRAA.[12]

Having established that the defendants may be under the *Hallie* umbrella, we must now turn to whether the RRAA — and, by extension, the private defendants — acted pursuant to a "clearly articulated and affirmatively expressed" state policy that "foreseeably will result in anticompetitive effects." 471 U.S. at 43-44.

Defendants argue this "clearly articulated" state policy is found in the Municipal Authorities Act (MAA).[13] DI 41 at 9-11; DI 43-1 at 18-23. The MAA notes that the scope of projects permitted for municipal authorities include "financing working capital; acquiring,

---

[11] We will discuss *Noerr-Pennington* immunity in the subsequent section.

[12] In *A.D. Bedell Wholesale Co., v. Philip Morris, Inc.*, 263 F.3d 239 (3d Cir. 2001), the Third Circuit applied the *Midcal* analysis to a settlement agreement between a tobacco company and state Attorneys General. We find *Bedell* distinguishable from this case for purposes of the *Parker* analysis because "the anticompetitive injury [in *Bedell*] resulted from the tobacco companies' conduct after implementation of the Multistate Settlement Agreement, and not from any further positive action by the States." *Id.* at 258. Here, the key anticompetitive injury flowed from the municipal airport authority's choices — including the decision to forgo working with plaintiffs and to purchase the private defendants' companies. It does not stem from private actions "after implementation" of the municipal conduct.

[13] Plaintiffs state that the RRAA is a municipal airport authority, and plaintiffs do not dispute that the RRAA is governed by the MAA. DI 33 ¶ 4; DI 50 at 10-14.

holding, constructing, financing, improving, maintaining and operating, owning or leasing, either in the capacity of lessor or lessee, projects of the following kind and character." 53 Pa. Cons. Stat. § 5607(a). Moreover, these projects include "airports and all facilities necessary or incident thereto." § 5607(a)(3).

Additionally, the MAA lists a series of powers that authorities may exercise, and notes that "[e]very authority may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including, but without limiting the generality of the foregoing, the following rights and powers":

> To acquire, purchase, hold, lease as lessee and use any franchise, property, real, personal or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the authority, and to sell, lease as lessor, transfer and dispose of any property or interest therein at any time acquired by it.

§ 5607(d)(4)

> To acquire by purchase, lease or otherwise and to construct, improve, maintain, repair and operate projects.

§ 5607(d)(5)

> [T]o determine by itself exclusively the services and improvements required to provide adequate, safe and reasonable service, including extensions thereof, in the areas served.

§ 5607(d)(9).

In *Susquehanna*, the court concluded that the MAA permitted an airport to exercise eminent domain over an adjacent tract of land, despite plaintiff's claims that the airport's "true motive[]" included a desire to eliminate competition for airport parking business. 423 F. Supp. at 476. The language of the MAA — including the scope of projects permitted, and that a power outlined in the act is "[t]o have the power of eminent domain" — allowed the authority to "operate and expand airport facilities pursuant to a

clearly articulated state policy."[14] *Id.* at 479. Further, the court concluded "[t]hat anticompetitive effects are a foreseeable result of an authority's power to take property by eminent domain is obvious." *Id.* Thus, the airport authority was entitled to *Parker* immunity. *Id.*

Like the power to exercise eminent domain in *Susquehanna*, the authority to "purchase" and "acquire" property, as well as the power to "determine by itself exclusively the services and improvements" required at the airport, are expressly outlined in the MAA. Thus, the MAA encompasses approving a plan to purchase Reading Jet Center, Inc. and Millennium Aviation, Inc., and deciding to exercise an exclusive right to sell fuel at the airport.

We also note that the MAA contemplates that this authority will be used in connection with supporting "airports and all facilities necessary or incident thereto." Airports, like the Reading Regional Airport, are subject to the rules of the FAA. DI 33 ¶ 4. It is thus foreseeable — and, in fact, expected — that airports will follow FAA rules and guidance. FAA Advisory Circular 150/5190-6, says "[t]he owner of a public-use airport (public or private) may elect to provide any or all of the aeronautical services needed by the public at the airport" and that "[a]n example of an airport sponsor choosing to provide an aeronautical service would be aircraft fueling." FAA Advisory Circular No. 150/5190-6 ¶ b.1 Thus, it is foreseeable that airports would exercise this exclusive right to provide aeronautical services, including providing fuel. Like the use of eminent domain in *Susquehanna*, the anticompetitive effects of exercising an exclusive right to provide fuel are "obvious." 423 F. Supp. at 479.

---

[14] In *Susquehanna*, the court noted that even if there is a "market participant exception" to *Parker* immunity, it did not apply because exercising eminent domain is a "power unique to the government." 423 F. Supp. 2d at 483. Similarly, exercising an exclusive right to become a fixed-based operator is a power unique to an airport authority. *See* FAA Advisory Circular 150/5190-6.

We therefore find that the RRAA, and the private defendants that worked with the RRAA, are entitled to *Parker* immunity because they acted pursuant to a "clearly articulated and affirmatively expressed" state policy that "foreseeably will result in anticompetitive effects.[15] *Hallie*, 471 U.S. at 43-44.

This determination is in line with other courts that have analyzed state airport authority statutes and concluded they confer *Parker* immunity on airports to control the sale of jet fuel. *See Rectrix*, 610 F.3d at 12-14 (extending *Parker* immunity to an airport commission to restrict the sale of jet fuel based on Massachusetts law); *In re Jet 1 Ctr., Inc.*, 322 B.R. at 196 (same under Florida law); *see also Commuter Trans. Sys., Inc. v. Hillsborough Cnty. Aviation Auth.*, 801 F.2d 1286, 1290 (11th Cir. 1986), *abrogated on other grounds* (granting an aviation authority *Parker* immunity based on decision to limit limousine operators at airport); *Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 914-15 (8th Cir. 1997) (granting *Parker*

[15] The *Susquehanna* court also grappled with the argument that the anticompetitive provision in the MAA undercuts *Parker* immunity. The MAA states the following:

> The purpose and intent of this chapter being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises, none of the powers granted by this chapter shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

§ 5607(b)(2). The *Susquehanna* court, relying on *Thompson Appeal*, 233 A.2d 237, 239 (Pa. 1967), reasoned that the anticompetitive provision deliberately excludes the power to "acquire and hold property," suggesting the right to exercise eminent domain should not be disturbed by this provision. 423 F. Supp. at 480-81. Similarly, neither acquiring nor purchasing property appear in the anticompetitive provision, persuading us that the legislature could have foreseen the anticompetitive effects of these activities. Additionally, the statute is focused on "existing enterprises serving substantially the same purposes." Plaintiffs, however, did not sell fuel at the airport, but rather were hoping to enter the market. DI 33; DI 38 at 2.

immunity to airport commission under Arkansas law that allowed them to impose a concession fee on rental car companies at the airport).

Plaintiffs counter that to enjoy *Parker* immunity, the state policy and its anticompetitive effects must be more clearly articulated. For instance, plaintiff points to *Yeager's Fuel, Inc. v. Penn. Power & Light Co*., 22 F.3d 1260, 1263 (3d Cir. 1994), which extended *Parker* immunity to an electrical company facing antitrust claims from oil dealers for offering incentives to builders, developers, and consumers to install energy efficient systems. The Third Circuit looked to a Pennsylvania law that required utility companies to submit information to the Pennsylvania Utilities Commission (PUC) about programs to conserve energy, which should include "educational, audit, loan, rebate, third-party financing and load management efforts to shift load from peak to off-peak periods." *Id*. at 1267 (quoting 66 Pa. Cons. Stat. Ann. § 524 (a)(3)). It noted that Pennsylvania statutes "expressly provide for PUC regulations of rates, foresee the establishment of rebate and load management programs and authorize the PUC to evaluate such programs," which plaintiffs argue is clearer — and more obviously anticompetitive — than what is authorized by the MAA.

We disagree with plaintiffs because the MAA specifically contemplates the power to "acquire" and "purchase" property, as well to determine the "services and improvements" necessary at an airport, which allows airport authorities to engage in the activities alleged here. This, combined with the FAA guidance that allows airports to exercise an exclusive right to become an FBO, demonstrates the foreseeability of anticompetitive results. Therefore, we conclude that defendants are entitled to immunity on their antitrust claims under the doctrine of *Parker* immunity.

B. Defendants are also entitled to *Noerr-Pennington* immunity.

The *Noerr-Pennington* doctrine[16] "immunizes parties involved in petitioning the government." *A.D. Bedell Wholesale Co. v. Phillip Morris Inc.*, 263 F.3d 239, 250 (3d Cir. 2001). The *Noerr-Pennington* doctrine is a "corollary to *Parker*" and holds that "federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379-80 (1991). "This doctrine, like *Parker*, rests ultimately upon a recognition that the antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'" *Id.* at 380 (quoting *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 141 (1961)).

*Noerr-Pennington* immunity exists even if private parties have an "improper purpose or motive." *Bedell*, 263 at 250*; see also Omni*, 499 U.S. at 380 (noting "[t]hat a private party's political motives are selfish is irrelevant"); *Noerr*, 365 U.S. at 129 (applying immunity even though the publicity campaign was described as "vicious, corrupt, and fraudulent").

---

[16] The *Noerr-Pennington* doctrine embraces the principle that "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961). In *Noerr*, truck operators brought a lawsuit against railroads alleging they violated the Clayton and Sherman Acts, in part, by conducting "a publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business." *Id.* at 129. The Supreme Court held that this political exercise did not violate the Sherman Act and that "its legality was not at all affected by any anticompetitive purpose it may have had." *Id.* at 139, 145. In *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965), the Supreme Court reaffirmed the holding in *Noerr* and stated, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." The *Noerr-Pennington* doctrine applies to individuals seeking action from municipal governments. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 357 (1991).

Additionally, the immunity applies to both antitrust injuries "which result from the petitioning itself" and those that are "caused by government action which results from the petitioning." *Bedell*, 263 F.3d at 251.

In *Bedell*, the Third Circuit applied *Noerr-Pennington* immunity to tobacco companies that negotiated a settlement agreement with sovereign states. *Id*. at 252. The companies' attempt to "influence public officials" by trying to convince the Attorneys General to accept a settlement in exchange for dismissing numerous lawsuits constituted "petitioning activity" within the meaning of *Noerr-Pennington* and therefore conferred immunity. *Id*.; *see also Greenwood Utils. Comm'n v. Mississippi Power Co.,* 751 F.2d 1484, 1505 (extending *Noerr-Pennington* to a company that negotiated a restrictive contract provision with the Southeastern Power Administration in Mississippi and noting there is no reason to apply the doctrine differently "when the government's decision is embodied in a contract with a private entity rather than in a regulation or statute"); *Erie Builders Concrete Co. v. Erie-Western Pa. Port Auth.*, 705 F. Supp. 1125, 1130-31 (W.D. Pa. 1989) (finding any attempt by private defendants to influence the Port Authority to lease bayfront dock facilities to be covered by the *Noerr-Pennington* doctrine); *Sea Air Shuttle Corp., v. Virgin Islands Port Auth.*, 782 F. Supp. 1070, 1077 (D.V.I. 1991) (finding *Noerr-Pennington* immunity extended to an airboat company for its acts petitioning the Virgin Island Port Authority for an exclusive lease to use seaplane ramps).

We find that the private defendants' conduct here falls within the bounds of the *Noerr-Pennington* doctrine. Private defendants petitioned the RRAA to purchase their companies and take over the exclusive right to provide fuel at the airport. Even if defendants acted with an "improper purpose or motive," *Bedell*, 263 F.3d at 250, in order to "seek[] anticompetitive action from the government," *Omni*, 499 U.S. at 379-80, they are still shielded from liability by the

*Noerr-Pennington* doctrine. Any injuries caused "from the petitioning itself" and "by government actions which results from the petitioning" are protected under the doctrine. *Bedell*, 263 F.3d at 251. Therefore, the private defendants are immune from liability arising out of their attempts to convince the RRAA to purchase their companies, as well as the eventual approval of the deal.

There is an exception to the *Noerr-Pennington* doctrine that could expose defendants to liability if their actions are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. This "sham" exception applies only in situations where individuals use "the governmental *process* — as opposed to the *outcome* of that process — as an anticompetitive weapon." *Omni*, 499 U.S. at 380. It does not apply when a defendant "genuinely seeks to achieve his governmental result, but does so *through improper means*." *Id*. (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc*., 486 U.S. 492, 507 n.10 (1988)).

In *Armstrong*, the Third Circuit held that a hospital and staff physicians were entitled to *Noerr-Pennington* immunity for their efforts to block a new surgical center from obtaining a required certificate from the Pennsylvania Department of Health, even though defendants allegedly submitted "false and misleading" information to the department. 185 F.3d at 155-56. Because this petitioning was aimed at a governmental action — the denial of the certificate — and the "sole antitrust injury" was caused by this denial, the "sham" exception did not apply. *Id*. at 159.

Here, plaintiffs' antitrust injury stems from the "outcome" of a governmental process — namely, the decision to halt plaintiffs' project and purchase defendants' companies instead. There is no question that defendants "genuinely [sought] to achieve [their] governmental result,"

and, in fact, did achieve such a result. Even though plaintiffs allege that defendants did so through "improper means," including "derogatory and false statements," *Armstrong* and *Omni* counsel that this does not render applicable the "sham" exception. DI 33 ¶ 45. Therefore, defendants are also entitled to immunity on their antitrust claims under *Noerr-Pennington*.

C. We decline to exercise jurisdiction over the remaining state law claims

There is no diversity jurisdiction in this case, and under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." Here, we have dismissed plaintiffs' federal claims and we will therefore decline to exercise jurisdiction over the remaining state law claims.[17] *See Greco v. Senchak*, 627 F. App'x 146, 150-51 (3d Cir. 2015) (affirming district court's dismissal of remainder of state law claims after dismissal of federal claim).

## V. Conclusion

For the reasons discussed above, we dismiss plaintiffs' Clayton and Sherman Act claims (Counts I and II) because defendants are entitled to immunity. We decline to exercise supplemental jurisdiction over the remaining state law claims. The motions to dismiss from the Knight defendants (DI 41), Muller defendants (DI 43), and David Heath (DI 64) are granted without prejudice.

---

[17] Defendants now appear to agree that if the federal Counts I and II are dismissed, the case should be dismissed. *See generally* DI 87; DI 88; DI 89 (arguing the case should be dismissed under Federal Rule of Civil Procedure 19(b) because dismissed parties were indispensable to the federal claims in particular). The Muller defendants noted that, "[h]ere, as also argued by the Knight Defendants, Plaintiffs' interest in having a federal forum is limited." DI 89 at 7. Additionally, we need not evaluate defendants' supplemental arguments that the case should be dismissed on the basis of Fed. R. Civ. P. 19(b) after the airport defendants were dismissed because we find dismissal proper on immunity grounds. However, this may provide a separate basis to dismiss plaintiffs' claims, particularly because plaintiffs have repeatedly ignored court orders asking for a response to this argument. DI 86; DI 90.